## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DAVID LIMA, Individually and on Behalf of All Others Similarly Situated,<br><br>    v.<br><br>GENERAL MOTORS LLC; ONSTAR LLC; LEXISNEXIS RISK SOLUTIONS INC.; and VERISK ANALYTICS, INC.,<br><br>                  Defendants. | Case No.<br><br>Honorable<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Lima alleges the following upon personal knowledge, information and belief, the investigation of his attorneys, and publicly available materials. He brings this case on behalf of himself and others similarly situated against General Motors LLC, OnStar LLC, LexisNexis Risk Solutions Inc., and Verisk Analytics, Inc.

## INTRODUCTION

1.  General Motors has been selling data about the driving behavior of millions of people without informing affected drivers.

2.  GM vehicles come equipped with OnStar technology. In marketing, GM says that this technology provides emergency services, promotes safe driving, and allows for over-the-air emergency software updates.

3.  But what their marketing materials don't say is that OnStar technology

also collects a vast amount of driving data, from trip reports to "hard braking" events.

4.     GM does not advertise that it sells that driving data to the insurance industry.

5.     LexisNexis and Verisk are data brokers who sell data about people to insurance companies.

6.     LexisNexis and Verisk buy GM's driver data, use the data to perform risk "analyses" of individual drivers, and sell the data to auto insurance companies who ask for it.

7.     This invasion of privacy occurred without GM drivers' knowledge or consent. As a result, in addition to their loss of privacy, GM drivers have seen their auto insurance premiums increase and had trouble securing coverage.

## JURISDICTION AND VENUE

8.     This court has original subject matter jurisdiction under 28 U.S.C. section 1331 because plaintiff brings a claim under the Fair Credit Reporting Act, a federal law.

9.     This court also has original subject matter jurisdiction under the Class Action Fairness Act, 2 U.S.C. section 1332(d), because at least one member of the proposed class is a citizen of a state different from that of defendants; the amount in controversy exceeds $5,000,000, exclusive of interests and costs; and the proposed class comprises more than 100 class members.

10.     This Court has personal jurisdiction over defendants under 28 U.S.C. section 1407, because each defendant has sufficient minimum contacts in the Eastern District of Michigan, and because each defendant has otherwise intentionally availed itself of the markets within Michigan through business activities, such that the exercise of jurisdiction by this Court is proper and necessary.

11.     Venue is proper under 28 U.S.C. sections 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of Michigan, where GM is headquartered.

## PARTIES

**A. Plaintiff**

12.     Plaintiff David Lima resides in Indiana. He purchased a 2019 Chevrolet Corvette in 2020. He understood that GM would provide OnStar services for one year, after which he could renew, which he did not. He does not knowingly use OnStar. His LexisNexis consumer report revealed that GM had shared his driving data up through March 2024. He believes his driving data was shared with insurance companies, including his auto insurance provider. The rate for his 2019 Chevy Corvette increased from $702 to $820.

**B.     Defendants**

13.     Defendant General Motors LLC is a corporation headquartered in Detroit, Michigan and incorporated in Delaware. GM manufactures and sells vehicles with driving-data-collection capabilities such as OnStar, OnStar Smart

Driver, MyChevrolet, and MyCadillac. GM vehicles are sold and driven throughout Michigan.

14.     Defendant OnStar LLC is a corporation headquartered in Detroit, Michigan and incorporated in Delaware. OnStar is a subsidiary of General Motors LLC. OnStar develops and operates the driving-data-collection capabilities in GM vehicles, including Smart Driver.

15.     Defendant LexisNexis Risk Solutions Inc. is a corporation headquartered in New York, New York, and incorporated in Delaware. LexisNexis is a global data broker with a "Risk Solutions" division that caters to the auto insurance industry. It obtained driver data from GM and OnStar and made it available to insurance companies.

16.     Defendant Verisk Analytics, Inc. is a corporation headquartered in Jersey City, New Jersey and incorporated in Delaware. Verisk is a data broker that provides analytics and technology to support insurers. Verisk obtained driver data from GM and OnStar and made it available to insurance companies.

## **FACTUAL ALLEGATIONS**

**A. GM collects driving data through its OnStar service.**

17.     OnStar was founded in 1996, and GM first introduced the technology into vehicles in 1997. At a time when cellphones were still relatively rare, OnStar's primary function allowed drivers to connect to an OnStar operator (and, in turn,

emergency services) after an accident. It could also help track stolen vehicles.

18.     OnStar's functionality increased over the years, and with it, the amount and type of driving data the technology could collect. Internet connectivity also permitted the service to instantly transmit the data to GM. By the mid-2010s, OnStar could run diagnostic and maintenance checks on the vehicle's operating systems and provide turn-by-turn navigation.   By 2015, almost all new GM vehicles offered OnStar, at times branded as myChevrolet, myBuick, myGMC, and myCadillac.

19.     In 2016, OnStar introduced a feature called the "OnStar Smart Driver" to monitor and score driver behavior. OnStar said that Smart Driver would help drivers "maximize their vehicle's performance and reduce wear and tear on the vehicle."[1] It would also "provide[] driving insights on how you can become a smarter, safer driver."[2]

20.     OnStar Smart Driver captures many metrics about a vehicle's condition and performance such as: individual trip data; seat belt use; fuel levels; distance travelled; average speed; time driving over 80mph; and frequency and intensity of acceleration and braking.

---

[1] "The Evolution of OnStar," OnStar.com, https://www.onstar.com/why-onstar/evolution-of-onstar-innovations, last accessed April 26, 2024.

[2] "Know how you go with OnStar Smart Driver," OnStar.com, https://www.onstar.com/services/smart-driver, last accessed April 26, 2024.

**B.     GM sells the driving data to LexisNexis and Verisk**

21.     In March 2024, the New York Times broke the news that GM was selling the driving data collected through OnStar to two data brokers that cater to the auto insurance industry—LexisNexis and Verisk.

22.     Although GM collects many types and large volumes of driving data, the data sold to LexisNexis and Verisk often lacks context. For example, the shared data would not include information to explain the hard-braking incidents included in the report.

23.     Nevertheless, LexisNexis and Verisk analyze the purchased driving data to create a "risk score" for individual people that purports to reflect their driving abilities.

24.     LexisNexis and Verisk then sell the data and their "analyses" to automotive insurance companies. Those companies use the LexisNexis and Verisk reports to set or modify drivers' auto insurance quotes or premiums.

25.     LexisNexis operates a "Telematics Exchange," a "portal for sharing consumer-approved connected car data with insurers." As of 2022, the exchange, according to a LexisNexis news release, had "real-world driving behavior" collected "from over 10 million vehicles."

26.     Verisk similarly advertises to insurance companies its "[r]eliable, granular data and analytics on drivers, vehicles, and households" that can help

insurance companies "confidently navigate a volatile personal auto market."

27.    As a result of these offerings, some GM drivers have seen increased auto insurance premiums, or had trouble securing insurance at all.

**C.    Drivers do not consent to the collection, sale, and use of their driving data**

**1.    GM could have obtained drivers' explicit and knowing consent to the use of driving data.**

28.    In recent years, insurance companies have offered incentives to people who, by choice, install devices in their cars or download smartphone apps that monitor their driving, including how much they drive, how fast they take corners, how hard they hit the brakes, and whether they speed.

29.    Car companies have established relationships with insurance companies, so that if drivers want to sign up for what's called usage-based insurance — where rates are set based on monitoring of their driving habits — it's easy to collect that data wirelessly from their cars.

30.    But "drivers are historically reluctant to participate in these programs," as Ford Motor put it in a patent application.

31.    Defendants' scheme circumvents that reluctance by surreptitiously collecting, selling, and using driving data.

32.    Plaintiff did not know that GM was sharing his driving data with LexisNexis and Verisk, and in turn with insurance companies. He would not have

knowingly consented to GM's collection and sharing of his driving data with LexisNexis and Verisk.

33.    Plaintiff did not know that LexisNexis and Verisk were sharing his driving data with insurance companies. He would not have knowingly consented to LexisNexis and Verisk's sharing of his driving data with insurance companies, much less the use of the driving data to determine his driving abilities and insurance rates.

34.    Plaintiff now believes that GM provided his driving data to LexisNexis and Verisk, and that LexisNexis and Verisk provided the driving data to insurance companies. Plaintiff believes that the rise in his auto insurance premiums was caused by defendants' driving data sharing practices. He feels that defendants' driver-data collection and sharing practices invaded his privacy.

**2.    OnStar and Smart Driver's enrollment mislead drivers.**

35.    It is unclear to many drivers how they became enrolled in OnStar and Smart Driver.

36.    Some drivers may actively opt to enroll in the services through their phone app or the driver infotainment screen in their vehicle.

37.    Other drivers appear to have been enrolled at the time they purchased the vehicle.

38.    The New York Times reported that GM dealership employees are incentivized to enroll car buyers in the service. One said that his pay was docked if

he failed to sign up the buyer, and that that mandate came from GM, which sends the dealership a report card each month tracking the percentage of sign-ups.

39.     OnStar may be offered to new drivers on a trial basis (e.g., free for the first three months) or as a mandatory subscription on top of the vehicle's base price.

40.     Some GM vehicles automatically come with as many as eight years of "connected access." The connection allows GM to send software updates to the car, but it also means that the vehicle is continually transmitting driving data to GM.

41.     The New York Times article suggested that the dealership enrollment process does not provide car buyers with an opportunity to review and understand the terms of the enrollment, and that dealership employees are not trained to understand the terms of the services.

42.     According to reporting and consumer forums, some drivers with GM vehicles say they were tracked even when they did not turn on OnStar Smart Driver at all. Other drivers reported that the collection and sale of their data continued after they had discontinued the OnStar or Smart Driver service.

43.     Some drivers were actively misled about their Smart Driver enrollment. The New York Times Reporter found that while the OnStar app said that she and her husband were not enrolled in Smart Driver, the browser-based version of the account page, on GM.com, said that their car was enrolled in "OnStar Smart Driver+." GM told her that this discrepancy between the app and the website was

the result of "a bug" that affected a "small population" of customers.

### 3.   OnStar's terms and conditions did not put drivers on notice that their data would be sold and used by insurance companies.

44.    Even drivers who somehow accepted the OnStar or Smart Driver terms did not adequately consent to the sharing and use of their driver data.

45.    A decade ago, GM and other major automakers made a commitment to the Federal Trade Commission to provide "clear, meaningful and prominent" notice about the collection of driver behavior information, including why it is collected and "the types of entities with which the information may be shared."

46.    GM did not live up to that commitment here: it provided no notice to drivers about the sale of their driving data to data brokers, much less anything "clear, meaningful and prominent."

47.    GM and OnStar mislead customers about the purposes of OnStar and Smart Driver. GM markets OnStar and Smart Driver as features that improve driver safety; allow drivers to access software updates; and give drivers a better understanding of their own behaviors. Nowhere do defendants mention the real purpose of the service: the collection and sale of the driving data.

48.    OnStar's privacy statement is neatly hidden on its website and made inconspicuous in the app-download process. But even it does not mention Smart Driver. It names SiriusXM, research institutes, and auto loan providers as companies it might share data with—not data brokers that cater to the auto insurance industry.

49.     The enrollment screen shown during the dealership enrollment process also says nothing about risk-profiling or insurance companies. It does not event hint at the possibility that anyone but GM and the driver would receive the collected data:



Dealers are instructed to show customers this screen during the enrollment for OnStar and Smart Driver.

50.     Before March 2024, the Smart Driver FAQ[3] also did not disclose that OnStar was disclosing driving data. Instead, it implied the opposite:



**D.     Drivers are harmed.**

51.     GM deceives users into believing that it is collecting their driving data in order to help them become safer drivers—if the driver is aware of the data

---

[3] "Smart Driver FAQ," OnStar.com, as the website appeared on January 24, 2024, https://web.archive.org/web/20240116231547/https://www.onstar.com/support/faq/smart-driver.

collection at all. Defendants all profit from the sale of the driving data at the expense of the drivers, who don't see a penny from the sale of their data.

52.    Defendants' scheme violates drivers' privacy.

53.    The driving data that GM sells is highly personal. Drivers do not expect that their car company is selling trip-by-trip reports to data brokers.

54.    Defendants' practices came as a surprise to GM drivers and the public. California's privacy regulator is currently investigating automakers' data collection practices, and last month, Senator Edward Markey of Massachusetts also urged the Federal Trade Commission to investigate.

55.    Jen Caltrider, a researcher at Mozilla who researches automotive privacy policies, said that drivers have little idea about what they are consenting to when it comes to data collection. She said it is "impossible for consumers to try and understand" the legalese-filled policies for car companies, their connected services and their apps. She called cars "a privacy nightmare."

56.    Defendants' scheme also results in increased insurance premiums for drivers. As a result of LexisNexis and Verisk's reports, drivers are seeing their existing insurance rates increase, or have trouble securing coverage at all. This occurs even though the driving data, and in turn LexisNexis's and Verisk's "analyses" lack context (e.g., driving conditions) for the reported driving behavior.

**STATUTE OF LIMITATIONS**

57.     Defendants did not disclose how they sold or otherwise used driving data.

58.     Instead, GM and OnStar actively concealed their collection and sale of the data by misleading drivers about the purpose and function of OnStar and Smart Driver.

59.     Defendants kept their behavior secret because they understood that drivers would not knowingly consent to this sale and use of their data.

60.     As a result of defendants' fraudulent concealment of the driving data use and sale, it was not until the March 2024 New York Times articles that the public and GM drivers understood the truth.

61.     Thus, any applicable statute of limitations has been either tolled or accrued only last month.

62.     In addition, defendants' actions and omissions constituted overt acts that began a new statute of limitations because those acts advanced the unfair objectives of the scheme. Each transmission of driver data to LexisNexis, Verisk, and insurance companies were new and independent acts that perpetuated the scheme.

## CLASS ALLEGATIONS

63.     Plaintiff brings this case as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3), on behalf of himself and all other similarly situated.

64.     Plaintiff brings this case on behalf of classes as defined as follows:

A.     The class: All drivers whose GM-manufactured vehicles collected and shared driving data with LexisNexis and/or Verisk.

B.     The consumer-report subclass: A subset of the class encompassing those class members whose GM-reported driving data appeared on a LexisNexis or Verisk report provided to a third party.

C.     The Indiana subclass: A subset of the class encompassing those class members who reside in Indiana.

65.     Excluded from these classes are defendants and their employees or agents and any judicial official presiding over this action, and members of their families.

66.     There are thousands of members of the proposed classes, and the classes are thus so numerous that joinder of all members is impracticable. Identification of the class members is a matter capable of determination from defendants' records.

67.     Defendants have acted or refused to act on grounds that apply generally

to the classes, so that final injunctive relief or corresponding declaratory relief is appropriate as to the class as a whole.

68.    Common questions of law and fact exist as to all members of the classes. These questions predominate over any questions solely affecting individual members of the classes. Among the questions of law and fact common to the classes are:

A.    What types of driving data GM and OnStar regularly collected;

B.    What types of driving data GM and OnStar regularly shared and sold;

C.    Whether defendants' practices were unfair and deceptive;

D.    Whether class members consented to defendants' practices;

E.    Whether defendants' practices constitute an invasion of privacy;

F.    Whether defendants' conduct was knowing and willful;

G.    Whether defendants profited from their practices;

H.    Whether defendants are liable for damages, and the amount of such damages; and

I.    Whether defendants' conduct should be enjoined.

69.    Plaintiff will fairly and adequately represent the classes, protecting the interests of the class members. Plaintiff has retained competent counsel experienced in class action litigation and intends to prosecute this action vigorously.

70.    Plaintiff is a member of the class and the subclasses and he does not

have interests antagonistic to, or in conflict with, the interests of the other members of the classes and subclasses.

71.     Plaintiff's claims are typical of the claims of the members of the classes and subclasses.

72.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

**Claim 1. Violation of the Fair Credit Reporting Act, 15 U.S.C. section 1681e(b), brought by plaintiff and the consumer-report subclass against LexisNexis and Verisk**

73.     Plaintiff incorporates the allegations above.

74.     The Fair Credit Reporting Act promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies while also satisfying the important commercial need for consumer reports. 15 U.S.C. § 1681; see TRW Inc. v. Andrews, 534 U.S. 19, 23 (2001).

75.     LexisNexis and Verisk are consumer reporting agencies regulated by the Act.

76.     Plaintiff and subclass members are persons and consumers protected by the Act.

77.     The reports that LexisNexis and Verisk provided to auto insurance companies are consumer reports governed by the Act, because they bear upon the

drivers' character, general reputation, and mode of living and are used or collected, at least in part, to establish eligibility for insurance.

78.     Consumer reporting agencies must follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom a report relates. 15 U.S.C. § 1681e(b).

79.     LexisNexis and Verisk did not implement procedures to assure maximum possible accuracy regarding plaintiff's and the subclass's driving data. Instead, the reports presented the driving data as an accurate measure of the drivers' abilities, even though the reports lacked context for the reported driving events, including who was actually driving the vehicle at the time of the event.

80.     LexisNexis and Verisk knew that the reported driving data would be used to set and modify the insurance premiums of plaintiff and the subclass.

81.     LexisNexis and Verisk knowingly and willfully collected and produced inaccurate data metrics regarding plaintiff's and the subclass's driving data.

82.     As a result of LexisNexis's and Verisk's conduct, insurance companies and others who view the consumer reports receive and rely on an inaccurate representation of plaintiff's and the subclass's driving abilities.

83.     These deceptive acts and practices constitute reckless or negligent violations of the Fair Credit Reporting Act.

84.     As a result of the willful violations, plaintiff and the subclass are

entitled to actual, statutory, and punitive damages under 15 U.S.C. section 1681(n)(a)(1) and reasonable attorney fees and costs under 15 U.S.C. section 1681n(a)(3).

85.    As a result of the negligent violations, plaintiff and the subclass are entitled to actual damages under 15 U.S.C. section 1681o(a)(1) and reasonable attorney fees and costs under 15 U.S.C. section 1681o(a)(2).

### Claim 2. Violation of the Indiana Consumer Protection Act, Section 25-5-0.5-1, brought by plaintiff and the Indiana subclass against all defendants

86.    Plaintiff incorporates the allegations above.

87.    Defendants' collection, sale, and use of plaintiff's and the subclass's driving data without adequate disclosure was unfair and deceptive in violation of Ind. Code section 24-5-.05-3(a).

88.    Defendants intended to profit from the data sharing practices and intended to keep drivers in the dark about the practices.  GM and OnStar's marketing scheme intended to mislead plaintiff and the subclass about the purposes and capabilities of OnStar and Smart Driver, while LexisNexis and Verisk intended for plaintiff and the subclass to not learn about the sale of their data to insurance companies.

89.    Defendants did not fully inform plaintiff and the subclass that they were collecting, selling, and using their driving data. Instead, GM and OnStar

misrepresented the capabilities and purpose of the OnStar and Smart Driver services and misrepresented how any collected data would be shared. LexisNexis and Verisk likewise did not disclose to plaintiff and the subclass that they had received their driving data and were "analyzing" the data for their auto insurance reports.

90.     Defendants caused harm in that their practices invaded plaintiff's and the subclass's privacy, profited from plaintiff's the subclass's data without compensation, misreported plaintiff's and the subclass's driving abilities, and caused insurance rates to increase. Plaintiff and the subclass would not have consented to defendants' practices, had they known about them.

91.     As a result of defendants' violations of the Act, plaintiff and the subclass are entitled to actual damages, statutory damages, punitive damages, injunctive relief, and reasonable attorney fees and costs.

### Claim 3. Unjust enrichment, brought by plaintiff on behalf of the class against all defendants

92.     Plaintiff incorporates the allegations above.

93.     Plaintiff and the class unknowingly conferred the benefit of their driving data on defendants.

94.     Defendants knew and appreciated that benefit: GM and OnStar sold the information to LexisNexis and Verisk, and LexisNexis and Verisk in turn sold the information to insurance companies. Plaintiff and the class received no benefit from this sale and use of their data; it is inequitable for defendants to retain the profit

without payment for its value.

95.     Therefore, defendants have been unjustly enriched and plaintiff and the class are entitled to restitution.

**Claim 4. Invasion of privacy, brought by plaintiff and the class against all defendants**

96.     Plaintiff incorporate the allegations above.

97.     Plaintiff's and the class's driving data is sensitive information, information that plaintiff and the class wanted to remain private and nonpublic.

98.     In part because of defendants' own representations, plaintiff and the class reasonably expected that their driving data would be protected and secured against access by third parties and would not be disclosed to or obtained by unauthorized parties, or disclosed or obtained for any improper purpose. Plaintiff and the class thus had a right against improper intrusion into their data.

99.     Defendants intentionally intruded on the private affairs and concerns of plaintiff and the class by improperly accessing plaintiff's and the class's driving data and using it for profit and to report on plaintiff's and the class's driving abilities to auto insurance companies. Plaintiff and the class did not knowingly consent to these practices.

100.   Defendants' intrusions upon the private affairs and concerns of plaintiff and the class were substantial and would be highly offensive to a reasonable person.

101.   Defendants' intrusions harmed plaintiff and the class in that their

practices invaded plaintiff's and the class's privacy, profited from plaintiff's and the class's data without compensation, misreported plaintiff's and the class's driving abilities, and caused insurance rates to increase.

102. Plaintiff and the class seek appropriate relief for those injuries, including damages that that will reasonably compensate Plaintiff and the class for the harm to their privacy interests and disgorgement of profits made by defendants as a result of their intrusions.

## **PRAYER FOR RELIEF**

103. Plaintiff, on behalf of himself and other members of the class and subclasses, asks the court for the following relief:

    (a) An order certifying the proposed class and subclasses under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), designating plaintiff as a named representative of the class and subclasses, and appointing the attorneys below as class counsel under Rule 23(g);

    (b) Actual damages;

    (c) Statutory damages;

    (d) Punitive damages;

    (e) An order enjoining GM and OnStar from sharing Plaintiff's and the class's driving information with Verisk and LexisNexis;

(f)   An order enjoining LexisNexis and Verisk from sharing Plaintiff's and the class's driving information with their customers;

(g)   An order requiring LexisNexis and Verisk to delete Plaintiff and class member driving data in their possession;

(h)   Attorney fees and costs;

(i)   Pre- and post-judgment interest; and

(j)   For other relief that the court deems just and proper.

## JURY AND TRIAL DEMAND

104.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this complaint that are so triable.

DATED this 26th day of April, 2024.

BY: */s/  E. Powell Miller*
E. Powell Miller (P39487)
Emily E. Hughes (P68724)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
epm@millerlawpc.com
eeh@millerlawpc.com
dal@millerlawpc.com

**KELLER ROHRBACK L.L.P.**

Gretchen Freeman Cappio, P84390
Derek Loeser
Cari C. Laufenberg
Ryan P. McDevitt, P84389
Adele Daniel
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Telephone:  (206) 623-1900
Facsimile:  (206) 623-3384
gcappio@kellerrohrback.com
dloeser@kellerrohrback.com
claufenberg@kellerrohrback.com
rmcdevitt@kellerrohrback.com
adaniel@kellerrohrback.com

***Attorneys for Plaintiff David Lima***